Appellant now in Parker v. Brooks Life Sciences, Ms. Boyd. May it please the Court. My name is Amber Boyd, and I represent the appellant in this matter, Susan Parker. Your Honor, I would like to reserve two minutes for rebuttal. Will your Honors like a brief recitation of the facts? If not, I would like to proceed with the argument. Please proceed. Appellant is asking this Court to overturn the District Court's decision because it applied the wrong legal standard. The biggest mistake the District Court made in this case is that it required Parker to show that no reasonable person could find Brooks' reason credible. This is the wrong legal standard. This Court in Coleman v. Donahue stated specifically, specifically held that the plaintiff's burden is to show that a reasonable person could find Brooks' reason pretextual. So could I ask you, Ms. Boyd, I just want to make sure I understand your theory of this case. As I understand your theory, it is that these earlier emails from Jillian Williams to Parker, encouraging informal arrangements to cover a few minutes of a shift here or a shift there, represented one policy, and then that there was an abrupt shift to a strict enforcement policy after the Arizona vacation and after Ms. Parker asks for the time off for her medical, her needle procedures. Is that right? Yes, Your Honor, that is correct. Okay, and also it seems to me a part of your case has to be, and I'm not sure whether the information, the record supports this, but there is the earlier meeting that Williams has, which actually includes some people from the human resources area, in which they discuss the fact that she wasn't following the company's paid time off policy, and there's a follow-up email. And I take it that the Brooks Life Science people characterize that as a preliminary disciplinary step, whereas you characterize that, or your client characterizes that, as something more in the nature of a conversation, that not every conversation is a disciplinary act. Is that correct, too? Because that's a difficult piece of information for her. That's correct, Your Honor, and I think that that piece of information, or the May 10th email that was titled talking points, could seem, would be more difficult if not for the subsequent emails where Ms. Williams, her manager, praises her for being flexible, praises her for working out the trading shifts between her and her coworker. So, I think because of what has occurred between that May 10th and then during the time of termination, which is October, that five-month gap, there was a lot of things happening in between that. Specifically, Williams' emails to Parker praising her for doing the very same thing in which she then terminates her door, which is the trading shifts, majority of the trading shifts. What about, you assert a couple of times in your brief that Parker never allowed a trainee to take over her shift without approval. But that's not quite the way I would describe it. It looks like she was planning on doing that, but she actually gets fired before the event takes place. So, in that rather literal sense, maybe it did never happen, but was there any other time other than this event that didn't take place where she was accused of allowing a trainee to take over and that was inaccurate? No, there were no other times that she asked a trainee to cover her shift. And like your Honor stated, the actual, the trainee never actually covered her shift because she was terminated. So, your opponents spend a fair amount of time talking about two things. One, a non-discriminatory reason that they articulated for terminating her, that she wasn't putting things in workday, she wasn't following the paid time off policy. And two, they also urge that the information that came to Williams after she comes back from vacation, that there had been these incidents that hadn't been properly handled, was an intervening cause and therefore, whatever else may have gone on before is of no importance because here was this intervening cause that justified firing her. They do, the defendant does, Brooks does spend a lot of time stating, discussing the intervening event. But I believe this case is more like Culver, and in Culver being Gorman, the employee was terminated three days after engaging in protective activity. And then the defendant, the employer, states that because she was insubordinate between those three days, that she was going to be terminated because of that insubordination during the three days. The court did not agree with the defendant in that case because the court surmised, because of the prior performance evaluations and because of the prior praise for the plaintiff and for the plaintiff's alleging that she was never insubordinate, the court said that there was a radical shift in the defendant's perception of the plaintiff. And the same could be, is that it's true in this case. Parker requests a reasonable accommodation and then two days later, she's terminated. And that she's terminated for the very same things in which she was previously praised, especially when you look at that five day span of time. She never received a corrective action. It was only, you know, five months previously that was the title talking points and that the training never actually covered her shift. In Coleman v. Donahue, this court specifically held that the plaintiff's burden is to show that a reasonable person could find Brooke's reason pretextual. In Coleman, the court held that an employee must only show that a reasonable person could find the employer's reason unworthy of credence. By requiring Parker to show that no reasonable person instead of a reasonable person, the court has held Parker to a higher standard. The higher standard is not supported by case law and neither the district court nor their employer provided any cases that overturned Coleman or any cases that changed that standard. By heightening the standard, the district court consequently changes the summary judgment standard. And they do it in two ways. First, by hiding Parker's burden, the court does not give plaintiff the benefit of all conflicts and all reasonable emphases that should be drawn from the evidence because it disregards the specific evidence that Parker presented rebutting defendant's reason for termination. And secondly, because the court increased Parker's burden, it disregarded the specific facts and evidence she presented that created a genuine issue of material facts. In this case, the disputed facts are outcome determinative. One of the defendant's reasons for terminating Parker was that after receiving a corrective action, she continued to switch shifts without management approval and allowed a new trainee to cover her shift. So let me just interrupt and say, when you say outcome determinative, I assume you just mean enough to show that there are disputed issues of fact requiring a trial. Certainly at a trial, a jury might believe Williams, a jury might believe Parker, a jury might, you know, assess the evidence however it wants to. We're just talking about whether she gets the trial. Yes, Your Honor. That is exactly what I'm discussing. Okay. First, Parker testified that she was never given a notice of a corrective action. The email was merely stated as a talking point, and the email was given to her on May 10, 2018. Do we know how the Brooks Life Science people normally handled corrective actions? Would the email have been entitled summary of corrective action or something like that? I don't know how they stated that or are implemented or provided corrective actions. The only thing that Parker was aware of- But this wasn't called a corrective action. So I guess you're arguing that taking the inferences favorably to Parker, she was entitled to think that it was more in the nature of a conversation than a corrective action. Exactly, Your Honor. Especially because that's what Parker testified to. And because there is difference in determination of what the document is, I believe that would create a genuine issue of material effect regarding- And then if the court doesn't deem to be that, and the court was then making the credibility determination based on the two people's testimony. Second, Parker submitted multiple emails that evidence that less than a month before requesting accommodation, Williams praised Parker for doing the very same thing for which she was later terminated, trading shifts. Parker never switched shifts with a new trainee. Thus, Parker presented specific evidence- And these emails reflected trading shifts and telling Williams after the fact, right? These were not seeking Williams's permission to swap shifts. Yes, Your Honor. And even to that point, at one point in time, Parker tells Williams, hey, I traded shifts with the coworker. I know I didn't tell you because you were on vacation. And Williams's response is basically perfect. Thank you for doing that. And really, her response is on August 14, 2018. She responds, absolutely. I am always available when you guys need me, but happy you were able to work that out between you two. So Williams is acknowledging that Parker did not ask her prior to changing her shift. Okay. The district court erred when it ignored Parker's evidence refuting defendant's alleged honest belief. Parker provided evidence that she never switched shifts, never received a corrective- Well, she was praised for switching shifts. She never received a corrective action, and she never switched shifts with a new trainee. This court has held that the only facts Parker has to refute are the employer's proper reasons. Parker has done- did just that. The district court- because the district court held Parker to the higher legal standard, the court made credibility determinations that are reserved for the jury. Parker presented specific evidence in the form of emails, testimony, and timing to refute defendant's reason for termination. When they disregarded that evidence, they also disregarded the standard. In Collier v. Budd, this court stated that if an employee offers specific evidence from which the fact finder may reasonably infer that the proper reason did not represent the truth, the case then turns on the credibility of the witness. And this court has stated in Dease v. Maskman Construction Company that the credibility issues are for the jury to decide, not the court. In this case, the jury should decide the credibility of each person's reasons. Your Honor, because I'm so close to time, I would like to reserve the rest of my time for rebuttal. Thank you. Certainly, Ms. Boyd. Mr. McLaughlin. Thank you, Your Honor. The dispute in this case seems to be not whether the court applied the correct burden of proof, but how it applied that. Indeed, the court's opinion is very clear that it applied the long-standing burdens of proof required by this court at each and every level. So, Mr. McLaughlin, let me tell you what I would like you to discuss for a minute. Yes, Your Honor. I did not see in your brief any real discussion of these earlier emails from Williams praising Parker and Baird for informally working out these shift coverage points. And that's actually rather important to me. And the other thing that I didn't see was why we're required to construe the May 2018 meeting and follow-up email as a corrective action when it wasn't labeled that way. I can't believe that every conversation in which criticism is conveyed at any workplace is a corrective action. That would be a terrible damper on communications between management and workers. So, I'm just worried that your brief certainly portrays a version of the facts that may be one that a jury would be quite persuaded by, but there are other facts, too. And so what do we do about these Williams emails saying, perfect, thanks, ladies, happy you're able to work it out, et cetera? Yes, Your Honor. First of all, we addressed the emails at pages 17 and 18 of our brief. And it is critical to note what the reason for the termination was. It is not, as counsel suggests, that it was simply for switching shifts. But you say at page 17, you say in a conclusory way, the emails do not evidence an intent by Williams to excuse policy compliance. But people don't say, and I am intending not to excuse. I mean, she's praising them. She's saying, perfect, thanks, ladies. That's at the top of page 18. And so you say on the first full paragraph on 18, nothing about these emails evidences that Williams did not expect compliance with the PTO policy. But that just strikes me as ipsy dixit. I mean, the inferences to be drawn from somebody saying, perfect, and you're doing a great job, thanks for working it out, or words to that effect, don't sound like you're about to get fired for doing those very things. And your honor, she was not fired for doing those very things. She was fired because she didn't follow the company's paid time off policy, which said that if you are going to take paid time off, you should A, request that ahead of time, B, you must record that. I understand that, but she had done the same thing in those instances. She had not worked certain times, and Baird had worked other times. I respectfully disagree, your honor. She had not gotten time off. And nothing in these emails references Parker getting time off and failing to request it or record it. She had merely switched shifts. And therein lies a fundamental difference. The policy which was addressed with her back in May, and in July, and in October, in each instance said, you are to record, request your time off, and record your time off. Nothing in the emails referenced by counsel identifies that. But what about the record with the emails telling Williams that Parker is going to cover a future shift when Baird shows up late, Baird is going to get early to a different shift, so that Parker could leave for a doctor's appointment, and that Baird had covered Parker's shift one day because Parker was sick. I mean, I guess I'm not sure what line you're trying to draw here, but it's unclear to me that the record supports it. Yes, your honor. The termination is because Parker was taking time off and not recording it. Nothing in those emails identifies that she took any time off, any different than her normal schedule. But if Baird is covering her shift, is she sitting next to Baird in the office? I mean, why isn't that time off? Well, so long as plaintiff was, or appellant was, working the same number of hours, yes, we would prefer to have that advance notice. But as we've referenced in the brief, there was an earlier email that said, we're not going to have other coverage. So please, the two of you work out who's here. So, so long as they are meeting their hours requirements, there's not a problem. And is there any evidence that she wasn't? This thing that she gets fired for, these two times that she needs to leave work 30 minutes early for a medical appointment, Baird agrees to cover it. Do we have any evidence in the record that she didn't, that she wasn't prepared to make up that time, just as she had done in all of these other instances? I don't see, I don't see a peep that she was actually being asked for, that she was asking Brooks to be paid for hours that she didn't work. That she hadn't requested time off and that she had not recorded her time off. And that's the problem. We require all of our employees to identify that time off and to record that time off. Is there evidence that she did, that she recorded the swaps in, that the earlier swaps, because those are times she's not working. You know, Baird is working for her. And did she record that? I apologize, your honor. There is, there's no evidence. The only evidence. So the only evidence is that it was okay with Williams for them to work this out between them. Correct, your honor. So long as they were both working their hours. And that's the problem. This goes to paid time off, not rotating the shifts. But if you want to take time off, you want to work fewer hours than you are obligated to work. Then you need to seek approval for that. And you need to record that. But do we even know that's the situation for these two 30 minute periods? Do we know that there weren't going to be two other 30 minute periods where Parker works an extra 30 minutes to cover for Baird? In other words, I mean, she gets fired so quickly after Williams comes back from Arizona that I don't see that. It just strikes me, I don't know who would win this case, but it strikes me that a jury could see this in a way differently from what you're describing, at least on this evidence. Well, your honor, this comes up in the context of pretext, in which, as this court's well aware, the standard is only whether Williams and Brooks had an honestly held belief. And there is no evidence that they did not have that belief. Indeed, when Williams sent her email for termination, it's critical to note, this was not an abrupt shift in any way. The same issue was raised in May. The same issue was raised in July. The same issue in October on the 8th, when Williams comes back to the office from Arizona, Parker requests time off for these two days. And even at that point, while Williams grants that request, she says, record your paid time off. So there can be no suggestion that her policy with respect to recording and requesting paid time off was entirely consistent May, July, October. And indeed, it was Williams who reached out to Parker, then on the 10th to say, are you taking off for these days? And she said, again, I believe I've told you before, you need to record this. So Williams position has been completely consistent throughout. The emails addressed a separate issue do not in any way contradict the Brooks policy that if you want to take time off, time when you are not going to be working, you need to record that and request that. She did not do that. And as the HR representative said in response to the request for termination, Ms. Barty said specifically, I was there. I heard these conversations. I know she's not adhered to the policy. But is that just credibility? Parker gives a different account of those conversations. Who do we believe? Well, it's not a credibility question, but there has to be evidence that Williams did not honestly believe her reasons. She stated that reason. But you were just saying that there was a certain content to the May conversation. And there are two accounts of people who were in the room. One Parker's account, the other account, this lady you just mentioned from HR. Well, well, those are not different accounts of what occurred there. That the Ms. Barty from HR was responding to the request for termination in support of that saying, I was involved in these. I'm aware she's been counseled about this. And she was aware of this and she's violated. And so there's nothing inconsistent there. And Judge, if I might, your second question a while ago was about corrective action, whether it was. It is not Brooke's position that there was required to be a corrective action issued in May for the termination to be valid. It is simply Williams statement that I, and this was more than just a casual conversation. It was a meeting called by Williams in which she had two HR representatives there with her, along with Parker, and in which she specifically said, you must request and record your paid time off. So there could be no dispute as to what the instructions were. Indeed, Williams followed that up with a separate email reiterating what was said there. So whether or not we would fully accept that Parker may not have viewed that as a corrective action, that's okay. It only goes to the issue of pretext, which is that Williams honestly believed that. And there's no evidence to suggest that Williams did not honestly believe that. And that is the burden placed by this court on the pretext issue is only whether Williams honestly believed that. And as to that issue, why couldn't a jury look at the other emails that Williams wrote to Baird and Parker to, I mean, people don't go around announcing their intents. We have to prove intent by circumstantial evidence. We have to prove honest belief by circumstantial evidence. Why don't we have evidence that moves in both directions here? Your Honor, we respectfully note there is nothing in those emails that in any way suggests that Parker was not obligated to comply with the paid time off policy. If she was taking time off from work and was not fulfilling her obligated hours, she had to request and record that time. There is no reference in any of those emails to suggest otherwise. And there's no reference in those emails from which anyone could infer as the district court held that anyone could infer that Williams did not have an honestly held belief as to her reasons for termination. And indeed, as noted, the HR representative expressly said the same. I was there. I heard it. It was valid. There is nothing to challenge that. The only other point I would note is counsel in their briefing has tried to suggest through the simple case and the Murkowski case that we can look to the statement attributed to Brinkman. Very briefly, Your Honors, we note in the simple case, there is no dispute. And the courts expressly held this is not some generic reference that somebody at the company has to have authority, global authority or overall authority for some decision-making process. Both the simple case and the Murkowski case expressly held and went through those facts to say that the statement, the person who made the statement was involved in the decision-making process with respect to this individual. It cannot be, as is the case in the current case, where there is no evidence that Brinkman knew of Parker, was aware of Parker, had any involvement whatsoever at any phase of her determination decision. The cases go to great length to say, be careful, the statement maker didn't have to actually make the decision to terminate, but they had to be involved in that decision-making process with respect to this individual. It is within the scope of Brinkman's employment to keep track of who works for the company. And he tells the Indiana Unemployment Insurance Office that she quit voluntarily for another job. Why he said that, I have no idea. But why isn't that at least a piece of evidence spoken by somebody who was acting within the scope of his employment for the company that would reflect the ultimate decision of the company? He wasn't the person who was the moving force to the termination, but the company speaks through its officers, and he's the HR manager. Well, again, Your Honor, a review of both the simple case and the Makowski case shows that the person who made the statement was intimately involved in this transaction, in this decision-making process. It is not that the director of HR, and again, I want to be careful about how specific any statement was in this reference. This is a filing or a submission by a third-party administrator to the Indiana Department of Workforce and Development. She attributes the conclusion to Brinkman that there was a resignation. There is, the record is- Okay, I think we have your position, counsel. Anything further, Ms. Boyd? Yes, Your Honors. First, I would like to note that the defendant's, Pelley's counsel states that this case centers on that there were hour requirements. That is not the case. At no time did the defendant state that Parker had to work a certain number of hours. Secondly, Pelley's counsel focused substantially about the procedure of requesting time off and then putting it into workday. Parker has submitted evidence of not only the email, but of Williams' testimony, where, and the fact that she wasn't told to put the information to workday. She provided that to the district court and that evidence was ignored. Secondly, the corrective action, there is a material fact in dispute whether that the May 10th talking points was actually a corrective action. Because Parker can testify that she was never told it was corrective action. She never believed it was corrective action. There was nothing, and there's nothing on the documentation that would make anybody believe that it was corrective action. And so, then the court basically has a kind of a he say, she said, and that's a credibility determination that needs to be cited by the juror. Lastly, this case is very similar today versus cult construction. The plaintiff in day complained of sexual harassment and then was terminated. The court determined in day that she proved and refuted the defendant's reason for termination because she provided such evidence of one, an increase in pay, and also good performance evaluations. This is true of this case as well. Parker in September of 2018 received a tiramisu cake from Williams saying, thank you so much for being so flexible. And she perceived further praise as well from Williams for being flexible and working with our coworkers to trade shifts with each other. Because Parker can prove the district court held her to a higher standard and make credibility to determinations and fail to consider all evidence, summary judgment should be denied, and this case should be reversed and sent to trial. Thank you, your honor. Thank you, Ms. Boyd. This case is taken under advisement.